## The North Chicago Rolling Mill Company

*v.*

## Lars F. Johnson.

*Filed at Ottawa May 15, 1885.*

1.  Negligence—master and servant—*duty of the former to use proper precautions for the safety of the latter—as, in the unloading of cars, to avoid collisions, etc.*   In an action to recover for personal injuries resulting from alleged negligence, it appeared the defendant company put the plaintiff and others of its servants to work unloading a railroad freight car standing on a spur of a side-track having connection with other tracks only at one end, and being a track not used for passing trains, and there being nothing to lead the laborers to believe the car they were unloading would be disturbed, and while so engaged the loaded car was violently struck by other cars which became detached from an engine used in switching cars in the yard, whereby the plaintiff was injured.'   It was *held*, that it was the duty of the defendant not to have brought on this peril without timely notice to the laborers so engaged; that either the cars ought not to have been brought into the position they were, without notice, or it should have been first ascertained that no danger to the laborers could result therefrom, and that the failure to do so was gross negligence.

2.   The attempt to bring a train of cars on the switch to a point where the defendant's servants were engaged in unloading a car, where the grade was a descending one, without notice to them, or any signal by the bell or whistle of the engine of the approach on such track, and without having the moving cars under control by proper and sufficient couplings and brakes attached, the yard-master knowing that men were engaged all around the car they were unloading, was gross negligence on the part of the defendant.

114   57
122  374
24a 218

114   57
127  644

114   57
128  661

114   57
133  262
134   64
134  213

114   57
143  255
146  610

114   57
152  467
152  593
155  634
45a 341

114   57
51a 514

114   57
46a 223

114   57
55a 247

114   57
65a 352

114   57
67a   30
67a 620
68a 247

114   57
69a   59
70a 334

114   57
75a 163
76a 600
76a 625

114   57
80a 397

114   57
92a ²634

114   57
182  222

114   57
193  ⁶177

114   57
104a ⁶ 33

114   57
110a ⁶ 13

114 57
209 6129
111a 1291
112a 6 9
114 57
113a 6 47

3. SAME—*as to whose duty it was to see that the appliances for controlling the moving cars were in proper order, etc.* In such an action, where the injury resulted from the uncoupling of certain cars in a train being switched in the defendant's yard, so that they could not be controlled by the engine, and from a defective brake on one of the detached cars which struck the car on which the plaintiff was engaged at work, it was held to be wholly immaterial whose duty it was to inspect the couplings of the cars, brakes, etc., or how on that occasion the engineer handled his train, and that proffered evidence in such respect was properly excluded.

4. SAME—*as to what is negligence—evidence in respect thereto—custom at other places as to the mode of handling railroad cars.* Where the charge of negligence of a defendant is the sudden starting of a detached car upon which the plaintiff was engaged in unloading brick, without previous notice or warning, by the collision of other cars being pushed back, evidence tending to show that the pushing of the cars instead of pulling them was not negligence, is inadmissible. The custom in other yards as to pushing or drawing cars in such a case is wholly immaterial.

5. SAME—*proof of custom as to watchfulness of railroad laborers in loading and unloading cars.* In an action by a laborer employed by defendant, to recover for an injury caused by the collision of other cars being switched, with the one on which he was unloading brick, without any signal or warning, the court sustained an objection to this question asked by the defendant of a witness, who was a switchman: "What, if anything, was the rule or custom as to laborers unloading and loading cars, and switchmen, with reference to the laborers looking out for the movement of their car while being loaded or unloaded?" *Held,* that the ruling was correct, as it was not shown there was any rule or custom in this respect. If the men were enjoined to keep a lookout constantly for the approach of trains while at work, that fact was susceptible of proof.

6. FELLOW-SERVANTS—*who regarded as holding that relation, within the rule exempting master from liability for injury to one by negligence of the other.* Servants of the same master, to be co-employes or fellow-servants, so as to exempt the master from liability on account of injuries sustained by one resulting from the negligence of the other, must be such as are directly coöperating with each other in a particular business,—that is, the same line of employment,—or such that their usual duties shall bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution.

7. The relations of the servants must be such that each, as to the other, by the exercise of ordinary caution can either prevent or remedy the negligent acts of the other, or protect himself against its consequences. Where there is no right or no opportunity of supervision, or where there is no independent will, and no right or opportunity to take measures to avoid the negligent acts of another without disobedience to the orders of an immediate superior, the doctrine exempting the master can have no application.

Appeal from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. W. H. Barnum, Judge, presiding.

Messrs. Willard & Driggs, for the appellant.

Messrs. Brandt & Hoffman, for the appellee.

Mr. Chief Justice Scholfield delivered the opinion of the Court:

Appellant was possessed of a rolling mill, and other works connected with it, and of adjoining yards, upon which were railway tracks used for the movement of cars belonging to appellant and to other parties with whom it did business, under the management and control of employes of appellant. Appellee was in the employ of appellant as a common laborer, and had been, for about one month, engaged in removing rails from its mill and placing them upon cars, though it was within the line of his duty to unload bricks from cars, and, in general, to perform any common labor required of him in and about the mill. He was under the immediate charge and control of one Clute, assistant foreman of the rail mill. He and a number of co-laborers were directed by Clute to unload the bricks from a car standing on one of appellant's tracks near the rolling mill, which they were proceeding to do, when, before they had quite finished the work, a train of cars was backed down the track on which the car they were unloading was standing, and against that car with such violence as to suddenly put it in motion, and thereby to knock appellee down and break his leg, and otherwise seriously injure him. The train causing this injury was under the immediate charge and control of one Crowley, appellant's yard-master, and neither Clute had any charge or control of the men operating the train, nor Crowley any charge or control of appellee and the other men engaged in unloading the bricks.

Appellant claims that the injury was caused, primarily, by a defective link coupling the cars somewhere near the middle of the train, which breaking, the train parted, and as it was being backed or pushed, with the engine in the rear, that part in advance beyond this break could not thereafter be controlled by the engine; and, secondarily, by a defective brake-wheel on the extreme advancing car, whereby it was impossible to check the momentum of the cars, the grade descending from the point at which the break occurred, to the car from which the bricks were being unloaded. Crowley had caused the carload of bricks to be placed where it was, and shortly before the injury had sent men to remove it, but finding that it was not yet unloaded, had countermanded that order and directed that certain coal cars be brought and backed in, and these composed the train causing the injury. He claims to have given a signal to stop the train when he saw that it was likely to hit the brick car, and also that when he saw, afterwards, that the train had not stopped, he cried out to the men unloading the brick, to look out, etc. It is not claimed that any bell was rung or whistle sounded to give warning of the approach of this train, and it is quite evident that no cries or words of warning reached the ears of appellee, and of some of the other laborers.

On the trial, appellant's counsel asked a witness, who was a switchman in appellant's yard, whether he was acquainted with the manner of switching in other yards, as to having the cars ahead or behind the engine. The question was objected to by appellee's counsel, and the objection was sustained by the court. It is now urged that this ruling was erroneous. This contention results, as we conceive, from a misapprehension of the issue before the jury. Counsel seem to understand that the fact the cars were *pushed* rather than *pulled* by the engine, is charged in the declaration as the negligence whereby the injury was caused. The *gist* of the charge of negligence, in each count, is, that the car wherefrom appellee and others

were unloading bricks, was, without any previous notice to them, by the ringing of the bell or otherwise, suddenly started or driven forward by the collision of the cars that were being pushed. The same result, precisely, might have been produced by pulling the cars. Whether it was negligent to back up a train is nowhere made a question, but the negligence charged lies wholly in the backing of the train, without previous notice, against a standing car which is being unloaded. It is not possible, therefore, that what may have been done in other yards in switching, in respect of having the cars before or behind the engine, could have in any degree enlightened the jury as to this issue. We do not, therefore, think anything decided in *Pennsylvania Co. v. Stoelke*, 104 Ill. 201, and *Pennsylvania Co. v. Hankey*, 93 id. 580, has any relevancy.

Again, counsel for the appellant asked the same witness, "What, if anything, was the rule or custom as to laborers unloading and loading cars, and switchmen, with reference to the laborers looking out for the movement of their car while being loaded or unloaded." Appellee's counsel objected to the question, and the court sustained the objection, and this ruling, also, is claimed to be erroneous. It is sufficient, to sustain this ruling, that it was not shown that there was any rule or custom in this respect, nor did the counsel offer or propose to prove any particular custom upon the subject. Apart from this, however, the witness seems to have been allowed to state, without objection, all that he knew in that regard. He says : "It sometimes happened there in the yard, that while a car was being loaded or unloaded it became necessary to couple to it and move it, for the purpose of placing other cars. It would happen once a day, on an average. We can not tell half a day in advance about the necessity for moving cars which are being loaded or unloaded. When it became necessary to move cars during the time of loading or unloading, we could notify the boss, and if we were going into the stock house, we would whistle or ring the bell. * * *

We might move a car whilst it was being unloaded. If it became necessary to do so, we notified the boss of the men. That was the custom." If the men were enjoined to keep a lookout constantly for the approach of trains while at work, the fact was susceptible of proof, but the evidence offered did not tend to prove that.

Another witness was asked by counsel for appellant,—he having previously stated that he was acquainted with the manner in which switching was done in other yards,—"Is it ordinarily expected of the switchmen to examine the coupling-pins and brakes, and things of that kind?" And again, "What was the custom at and before that time, in that yard, respecting the examination of links, pins and couplings, by the brakemen and switchmen?" Another witness, the engineer, was asked by the same counsel, "State whether you were managing your train in the usual and ordinary way." Another witness was asked by the same counsel whether he knew what the custom was in and around the city of Chicago in respect to switchmen in the yard examining each car, and seeing whether it is in order or not before they move it; and upon being answered in the affirmative, the counsel proposed to prove by this witness that "it is not the ordinary custom of switchmen in any yard, within the knowledge of this witness, to examine into the condition of the cars before they move them,—that is the duty of other persons." The court, on objection, held each of these questions inadmissible, and refused to allow them to be answered,—the last question, however, only so far as other yards in Chicago were concerned, the witness being permitted to state what was the custom of appellant in this respect,—and we are asked to reverse the judgment below because of these rulings, also. We think it enough to say, that in our opinion it was wholly unimportant whose duty it was to inspect the couplings of the cars, brakes, etc., and how, on that occasion, the engineer managed his train. The facts are uncontroverted that appellee

and others were put to work unloading a car standing on a spur of a side-track,—*i. e.*, a track having connection with other tracks only at one end. It was not at a place where there were passing trains. There was not a single circumstance in evidence tending to prove that a laborer at that car ought to have anticipated that it might be disturbed while being unloaded. The labor was wearisome and engrossing, and its performance required of the laborers immediate and constant attention. It was, therefore, the duty of appellant to bring no peril upon the laborer without first giving him timely notice. Either the cars ought not to have been brought into the position they were, before the bricks were unloaded, and without timely notice to the laborers of the danger thereby, or it should have been first ascertained that no danger to those laborers could result. No matter whose individual duty it was to inspect the company's brakes, etc., the obligation was upon appellant not to bring upon appellee and the other laborers, without previous timely notice, in the helpless condition they were, this danger, and to do so was, unquestionably, in fact, gross negligence, to which there was no contributive negligence on the part of appellee. The ruling was entirely correct, in our opinion. The proposed evidence, instead of enlightening, would only have tended to perplex and mislead the minds of the jury.

It is objected that the court below erred in submitting the question of comparative negligence to the jury, because there was no circumstance tending to show gross negligence on the part of appellant. We do not concur in this view. In addition to the circumstances before alluded to as tending to prove gross negligence upon the part of appellant, is the fact that we have previously stated, that from a point some distance in the direction of the connecting tracks there is a down-grade to the point where the car from which the bricks were being unloaded stood; and to bring cars to that point without having them certainly under control, while knowing,

as this yard-master did, that men were at the same time engaged all around the car taking out the bricks, and their attentions absorbed in their labors, is but little, if any, short of criminal recklessness.

Objection is also urged that the court erred in refusing to give the seventh in the series of instructions asked by the appellant. It reads as follows:

"If the jury believe, from the evidence, that plaintiff's usual employment at and before the time of the injury was to load and unload cars in the defendant's yard, and that it was the usual duty of those having control of the train in question to move cars in said yard before and after being unloaded, and that the plaintiff, and those having control of said train, whilst engaged in their respective employments, could observe how each did their work, then the said plaintiff and the persons having control of said engine were co-employes."

This falls short of an accurate statement of what is essential to constitute a co-employe, within the ruling in *Chicago and Northwestern Ry. Co.* v. *Moranda*, 93 Ill. 302, *Chicago and Alton Railroad Co.* v. *May, Admx.* 108 id. 288, and *Chicago and Eastern Illinois Railroad Co.* v. *Geary*, 110 id. 383. That ruling requires that the servants of the same master, to be co-employes, so as to exempt the master from liability on account of injuries sustained by one resulting from the negligence of the other, shall be directly coöperating with each other in a particular business,—*i. e.*, the same line of employment,—or that their usual duties shall bring them into habitual association, so that they may exercise a mutual influence upon each other promotive of proper caution. The idea is, that the relations between the servants must be such that each, as to the other, by the exercise of ordinary caution, can either prevent or remedy the negligent acts of the other, or protect himself against its consequences; and, of course, where there is no right or no opportunity of super-

vision, or where there is no independent will, and no right or opportunity to take measures to avoid the negligent acts of another without disobedience to the orders of his immediate superior, the doctrine can have no application. How can the laborer be profited by a knowledge of the usual manner of doing work in another department, if he is unable, in any reasonable way, while engaged in the proper discharge of his duties, and without disobedience to his immediate superiors, to influence the conduct of the laborers in that department? The instruction was properly refused.

Perceiving no sufficient ground upon which to reverse the judgment below, it is affirmed.

*Judgment affirmed.*